Adam C. Dawson (State Bar No. 136551)
　adawson@fbm.com
Erica Villanueva (State Bar No. 233148)
　evillanueva@fbm.com
Unnati Gandhi (State Bar No. 278340)
　ugandhi@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

Attorneys for Plaintiff
FELCOR LODGING TRUST INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FELCOR LODGING TRUST INCORPORATED, a Maryland corporation, and FELCOR/CSS HOLDINGS, L.P., a Delaware Limited Partnership,<br><br>　　　　　Plaintiff,<br><br>　　　vs.<br><br>COMMERCE & INDUSTRY INSURANCE COMPANY, a New York corporation,<br><br>　　　　　Defendant. | Case No. _____<br><br>**COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY RELIEF, AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs FELCOR LODGING TRUST INCORPORATED and FELCOR/CSS HOLDINGS, L.P. (hereinafter collectively referred to as "Plaintiff" or "FelCor") states against Defendant COMMERCE & INDUSTRY INSURANCE COMPANY (hereinafter referred to as "Defendant" or "AIG") as follows:

**NATURE OF ACTION AND RELIEF SOUGHT**

1.　　This is a case about an insurance company that unreasonably refused to honor its commitments.  Plaintiff seeks general damages and declaratory relief against Defendant for its

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

COMPLAINT

31003\4753013.1

1  breach of insurance contract.  Plaintiff also seeks general damages and punitive damages against
2  Defendant for its breach of the implied covenant of good faith and fair dealing.  Plaintiff's claims
3  against Defendant arise out of Defendant's partial refusal to fund a $13.5 million settlement of an
4  underlying lawsuit filed by Robert and Diane McNamara in the Superior Court of the State of
5  California, County of San Mateo.  The underlying lawsuit involved injuries that Mr. McNamara
6  suffered while staying at a FelCor-owned hotel located in Burlingame, California.

7        2.  Defendant wrongfully refused to pay $6 million of the total $13.5 million
8  settlement payment.  Defendant asserted that this portion of the settlement was being paid solely
9  to settle FelCor's "punitive damage" exposure, and under California law punitive damages are
10 uninsurable as a matter of public policy.  Defendant made this assertion despite the fact that, at
11 the time the underlying lawsuit was settled:  (a) there were no facts to support a punitive damages
12 award; (b) the McNamaras' complaint had not been amended to add a prayer for punitive
13 damages; and (c) FelCor's defense counsel had repeatedly advised Defendant that the
14 McNamaras' claim had a verdict value of as much as $20 million, based on compensatory
15 damage exposure alone.  Defendant took this position for the sole purpose of coercing Plaintiff
16 into accepting less money from Defendant than they were entitled to under the insurance policy.

17       3.  Defendant's wrongful breach of its contractual obligations forced Plaintiff to bear
18 a $6 million portion of the underlying settlement.  Defendant's refusal to fund this portion of the
19 settlement was unreasonable and without proper cause, and therefore constituted a breach of the
20 implied covenant of good faith and fair dealing.

## THE PARTIES

22       4.  Plaintiff FelCor Lodging Trust Incorporated ("FLTI") is a corporation organized
23 and existing under the laws of the State of Maryland, with its principal place of business at 545 E.
24 John Carpenter Freeway, Suite 1300, Irving, Texas 75062.  FLTI is a real estate investment trust.
25 Through its subsidiaries, FLTI owns over 40 hotels throughout the United States, including 11 in
26 California (more than in any other state).  At all times relevant hereto FLTI, through various
27 subsidiaries, is and was doing business in the Northern District of California.  Through those
28 subsidiaries, FLTI owns six hotels located within the Northern District of California.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

COMPLAINT - 2 -

31003\4753013.1

5. Plaintiff FelCor/CSS Holdings, L.P. ("FelCor, L.P.") is a limited partnership organized and existing under the laws of the State of Delaware, and is an indirect subsidiary of FLTI. At all times relevant hereto FelCor, L.P. is and was doing business in the Northern District of California. Specifically, FelCor, L.P. owns the Embassy Suites - San Francisco Airport Waterfront Hotel in Burlingame, California.

6. At all times relevant hereto, Plaintiff is informed and believes, and based thereon alleges, that Defendant Commerce & Industry Insurance Company was and is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York. On information and belief, Defendant is a member company of American International Group ("AIG").

7. At all times relevant hereto, Plaintiff is informed and believes, and based thereon alleges, that Defendant has been a corporation authorized to transact and has been transacting business in the Northern District of California as an admitted insurance carrier.

## JURISDICTION AND VENUE

8. This court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1), in that the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and is between citizens of different states. In addition, this court has personal jurisdiction over Defendant because it is a corporation that conducts business and has continuous and systematic contacts with the State of California. Defendant is admitted by the California Department of Insurance to issue insurance policies in this state.

9. Venue is proper in this district pursuant to 28 U.S.C. §§1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this district. Mr. McNamara suffered his injuries at a hotel located within this district, and the underlying McNamara lawsuit was filed, litigated, and settled within this district. It was within this district that Defendant exercised its right to participate in the defense of the underlying McNamara case and breached its duties to Plaintiff by unreasonably refusing to fund settlement.

## INTRADISTRICT ASSIGNMENT

10. Intradistrict assignment to the San Francisco or Oakland Division is proper

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT - 3 -

31003\4753013.1

because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County. Mr. McNamara suffered his injuries at a hotel located in San Mateo County, and the underlying McNamara lawsuit was filed, litigated, and settled in San Mateo County. It was within this district that Defendant exercised its right to participate in the defense of the underlying McNamara case and breached its duties to Plaintiff by unreasonably refusing to fund settlement.

## GENERAL ALLEGATIONS

**The Relevant Insurance Policies**

11. Plaintiff purchased a general liability policy from Federal Insurance Company ("Federal"), policy no. 7499-61-06 REU, for the policy period of January 1, 2012 to January 1, 2013 ("Primary Policy"). A copy of the Primary Policy is attached hereto as Exhibit A. The Primary Policy has a limit of liability of $1 million per occurrence, in excess of a self-insured retention ("SIR") of $250,000 per occurrence. (*See* Exh. A at A1.)

12. The Primary Policy provides that Federal will have a duty to defend any claim alleging potentially-covered liability, including liability for "Bodily Injury." (*Id.* at A5.) Under the terms of the Primary Policy, defense fees and costs can be used to satisfy the SIR, but do not erode the limits of liability. (*Id.* at A6-7, A127-133.)

13. FLTI is the first Named Insured under the Primary Policy. (*Id.* at A1.) By endorsement, the Primary Policy is modified to add as Named Insureds any subsidiary of FLTI. (*Id.* at A142.) Also by endorsement, the Primary Policy is modified to add as Additional Insureds any person or entity that FelCor is required by contract or agreement to add to the Primary Policy as an Additional Insured. (*Id.* at A92, A95-96.)

14. Plaintiff purchased an "Umbrella Prime Commercial Umbrella Liability Policy With CrisisResponse," policy no. 34264817, from Commerce & Industry Insurance Company for the policy period of January 1, 2012 to January 1, 2013 ("Umbrella Policy"). A copy of the Umbrella Policy is attached hereto as Exhibit B. The Umbrella Policy has a limit of liability of $25 million per occurrence. (*See* Exh. B at B1.)

15. FelCor and its subsidiaries are Named Insureds under the Umbrella Policy. (*Id.* at

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT - 4 -

31003\4753013.1

B1, B23.)  Under the Umbrella Policy, any person or organization that has been added to the Primary Policy as an Additional Insured is deemed to be an insured under the Umbrella Policy. (*Id.* at B21, B25, B27.)

16. Under the Umbrella Policy, Defendant agrees to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury…to which this insurance applies."  (*Id.* at B3.)

17. In the case of liability for Bodily Injury, the Umbrella Policy's "Retained Limit" (*i.e.*, its attachment point) is $1,250,000 – the combined limits of FelCor's SIR and Primary Policy.  (*Id.* at B25, B27.)

18. Plaintiff has paid all required premiums with respect to the Umbrella Policy and has satisfied all terms and conditions of the Umbrella Policy, including satisfaction of the $250,000 self-insured retention under the Primary Policy.

**The Underlying McNamara Action**

19. Robert McNamara was a private aircraft pilot for Occidental Petroleum Company. On the evening of November 6, 2012, Mr. McNamara was a guest at the Embassy Suites San Francisco Airport/Waterfront Hotel in Burlingame, California.  On the morning of November 7, 2012, Mr. McNamara was discovered unconscious in his guest room.  It was later determined that Mr. McNamara suffered carbon monoxide poisoning.  The source of the carbon monoxide was a pool and spa heating boiler located directly below Mr. McNamara's room.

20. On January 11, 2013 Mr. McNamara and his wife filed a personal injury lawsuit in the Superior Court of the State of California, County of San Mateo against Embassy Suites Management, LLC, FelCor, L.P., and DJONT Operations, L.L.C. (collectively, the "FelCor Defendants").[1]  The complaint also named as defendants two heating, ventilation, and air conditioning ("HVAC") contractors: (a) Paul Rieger Company, the HVAC contractor that initially installed and maintained the subject boiler; and (b) City Mechanical, Inc., the HVAC

---

[1] FelCor, L.P. owns the Burlingame hotel. FelCor, L.P. leases the Burlingame hotel to DJONT Operations, L.L.C. ("DJONT"), a wholly-owned subsidiary of FelCor. Pursuant to a management agreement between DJONT and Embassy Suites Management LLC (a subsidiary of Hilton Worldwide, Inc.), the latter manages the hotel.

contractor that allegedly had taken over maintenance of the pool and spa boiler by the time of the incident. The case was captioned *McNamara v. Embassy Suites Management, LLC, et al.*, and assigned case number CIV 519076 ("McNamara Action").

21. FelCor reported the McNamara Action to its liability insurers, including Federal and AIG. Neither Federal nor AIG issued a reservation of rights with respect to the McNamara Action. At no time has Federal or AIG ever questioned the fact that the McNamara Action asserts covered claims for damages because of "Bodily Injury," as defined in their policies.

22. Recognizing that the McNamara claim would certainly exceed FelCor's $250,000 SIR, Federal assumed control of the defense and appointed the Archer Norris firm to serve as defense counsel for the FelCor Defendants. From its position as an excess insurer, AIG monitored the McNamara litigation.

23. Archer Norris is a California law firm with five offices throughout the state. Among other things, the firm specializes in defense-side litigation and trial work, including the defense of catastrophic personal injury cases.

24. The Archer Norris firm reported frequently to the assigned Federal claims adjuster. AIG was copied on these reports. Through its defense counsel reports, the Archer Norris firm repeatedly advised Federal and AIG of several critical facts regarding the McNamara case:

(a) The FelCor Defendants had no defenses to liability in the McNamara Action;

(b) As a hotel owner, under California law the FelCor Defendants could be found jointly and severally liable for the entirety of Plaintiffs' economic and non-economic damages, giving the McNamara plaintiffs the option to recover 100% of any jury award directly from the FelCor Defendants, regardless of the jury's allocation of fault;

(c) Mr. McNamara was earning over $200,000 per year at the time of his injury, and was now unable to work;

(d) At trial, the McNamaras intended to seek total compensatory damages of at least $20 million;

(e) The McNamaras were represented by one of the most well-known and highly-respected plaintiffs' personal injury firms in Northern California, renowned for their trial work and their demonstrated high skill level in the courtroom;

(f) The McNamaras' settlement demand, conveyed in June 2014, was $20 million, and did not include any punitive damage component;

(g) In Archer Norris's assessment, the case had a verdict value of between $12 million and $20 million, **based on compensatory damage exposure alone**;

(h) In Archer Norris's assessment, the case could be settled in the $10-$15 million range.

**Defendant's Breach of Contract and Bad Faith Conduct**

25. AIG steadfastly refused to accept Archer Norris's assessment of the McNamara case. On August 6, 2014 Archer Norris sent AIG a report (a) explaining why, under California law, FelCor could be found jointly and severally liable for 100% of the jury's award, regardless of fault apportionment, and (b) providing a survey of similar California jury verdicts and concluding that the McNamara case had a verdict value of $12 - $20 million. But after a second failed attempt to mediate the case on September 10, 2014, AIG insisted that the value of the case was below $10 million. AIG also told FelCor that there was no real threat of punitive damages exposure in the case, and that the McNamaras' threatened motion to amend their complaint to add such a claim was mere posturing.

26. After the failed September 2014 mediation, AIG's New York-based claims representatives, Joel Padilla and Leslie Rutledge, advised FelCor that they wanted to bring in an additional defense firm to represent FelCor, purportedly to assist Archer Norris in preparing the case for trial. This law firm was Weinberg, Wheeler, Gunn & Dial LLP of Atlanta, Georgia; the attorney from that firm with primary involvement was Shawn Scott. At this point, the trial of the McNamara case was set to commence on December 1, 2014.

27. The AIG claims representatives described Mr. Scott as a trusted defense attorney whom AIG had used several times in other carbon monoxide cases. On September 26, 2014, Mr. Padilla, Ms. Rutledge and Mr. Scott flew to Irving, Texas to meet with FelCor representatives. At that meeting, Mr. Padilla and Ms. Rutledge presented their valuation of the McNamara case,

COMPLAINT - 7 -

which they claimed was no greater than $7.5 million; AIG therefore would not pay more than $6.5 million toward a settlement with the McNamaras. Mr. Scott told FelCor that he agreed with AIG's $7.5 million valuation of the case.

28. Meanwhile, AIG continued to flatly ignore Archer Norris's evaluation of the case and its assessment of FelCor's liability exposure, despite the fact that the Archer Norris attorneys were highly experienced California trial lawyers. For example, on October 16, 2014 Archer Norris sent AIG a report (a) explaining that the McNamaras were likely to recover well in excess of $10 million if the case proceeded to trial, and (b) advising that the case could be settled in the range of $10 - $15 million. Immediately thereafter, Mr. Scott sent the lead Archer Norris attorney an email, directing Archer Norris not to prepare any further reports for AIG; Mr. Scott wanted to handle all future reporting himself.

29. In other words, after receiving the October 16, 2014 report from Archer Norris, AIG made clear that it did not want to hear anything from Archer Norris that contradicted AIG's purported valuation of the case. At this point, AIG should have been listening to defense counsel and crediting their evaluation of the case. Instead, AIG was moving to manufacture a false threat of punitive damages, in order to coerce FelCor into paying a settlement that should have been AIG's responsibility alone.

30. Shortly after joining the defense team, on several different occasions, Mr. Scott raised alarm bells with his Archer Norris co-counsel about "new" facts which, he claimed, would somehow expose FelCor to liability for punitive damages. On each such occasion, the Archer Norris attorneys disagreed with Mr. Scott's assessment, and told him so. Indeed, at the time that Mr. Scott was making these assertions:

(a) the McNamaras' complaint did not even contain a prayer for punitive damages;

(b) the McNamaras' $20 million settlement demand did not contain a punitive damage component; and

(c) Archer Norris had assigned the case a verdict value of $12-$20 million, based on compensatory damage exposure alone.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT - 8 -

31003\4753013.1

1  Although the McNamaras eventually did file a motion to amend their complaint to add such a
2  claim, that motion was never ruled upon.

3        31.     Moreover, the Archer Norris attorneys felt strongly that the facts of the McNamara
4  Action could not have supported a punitive damages award. To find any defendant liable for
5  punitive damages, a California jury must conclude that the defendant acted with "malice," defined
6  as "conduct intended by the defendant to cause injury to the plaintiff or despicable conduct which
7  is carried on by the defendant with a willful and conscious disregard of the rights or safety of
8  others." To find a corporation liable for punitive damages, the jury also must conclude that the
9  conduct was authorized or ratified by an "officer, director, or managing agent" of the corporation
10 – *i.e.*, a person with authority to bind the corporation.

11       32.     As California-based attorneys specializing in the defense of personal injury
12 lawsuits, the Archer Norris attorneys were very familiar with the California legal standard for
13 awarding punitive damages, and the level of scienter and type of corporate conduct required in
14 order to find a corporation (as opposed to an individual) liable for punitive damages. The Archer
15 Norris attorneys were confident that, on the facts of this case, punitive damages would not be
16 assessed against the FelCor Defendants.

17       33.     In mid-October 2014, the FelCor Defendants discovered a few new documents,
18 some which would have to be produced in the underlying McNamara litigation. Though the
19 documents were not helpful to FelCor, they would not have generated punitive damage risk.
20 Nevertheless, AIG and Mr. Scott immediately seized on the documents, claiming they increased
21 the likelihood that the jury would award punitive damages.

22       34.     Once again, the Archer Norris attorneys wholeheartedly disagreed with AIG's and
23 Mr. Scott's assessment of the newly-discovered documents. The Archer Norris attorneys
24 correctly recognized that the documents showed nothing more than ordinary negligence by low-
25 level actors who had no corporate authority to bind FelCor. Thus, the Archer Norris attorneys
26 insisted that these documents would create no greater propensity for a jury to award punitive
27 damages. The Archer Norris attorneys believed that, if anything, the documents might impact the
28 overall compensatory damage award, and/or the allocation of that award among the defendants.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT       - 9 -      31003\4753013.1

35. At around the same time, however (*i.e.*, in mid-to-late October 2014), Mr. Scott asked the Archer Norris attorneys not to be actively involved in settlement discussions that were then taking place between the McNamaras and FelCor. Mr. Scott took the lead in those discussions, and late in the evening on Monday, October 27, 2014 the McNamaras ultimately agreed to reduce their settlement demand to $13.5 million. The McNamaras' counsel cautioned that the $13.5 million demand would permanently expire at noon on Friday, October 31, 2014.

36. AIG addressed the McNamara's $13.5 million offer with a hurriedly-prepared letter, delivered on Wednesday, October 29, 2014.[2] In the letter, AIG refused to increase the amount it was willing to contribute to any settlement. AIG claimed that the newly-discovered documents would only generate punitive damage exposure, and would have no impact on the compensatory damages a jury might award. Thus, AIG claimed it had no obligation to contribute any more than the amount it had previously stated it was willing to contribute toward settlement – $6.5 million.

37. At the same time, however, AIG actually encouraged FelCor to accept the McNamaras' latest demand, stating: "AIG suggests that the [FelCor] Defendants take whatever action they deem appropriate to protect their interests." AIG then offered to allow FelCor to accept the settlement demand, if FelCor was willing to make up the $6 million shortfall.

38. In a separate email, Mr. Padilla made the same offer: "In the event that Felcor intends to settle this matter for $13.5 million a portion totaling $7.5 million will be paid by insurance. Of the $7.5 million compensatory damage portion of the settlement, $1 million will be paid by Federal/Chubb under its primary policy and $6.5 million will be paid by AIG under the C&I umbrella policy. AIG will not assert breach of cooperation or a voluntary payment in connection with that anticipated $13.5 million settlement, nor will it require a waiver by Felcor of any claim against AIG. AIG will not agree to mediate any dispute between AIG and Felcor concerning Felcor's contribution to the settlement for the punitive damage portion of the claim."

---

[2] In a second hurriedly-prepared letter, delivered the same date and at the same time, AIG reserved its right to deny coverage for the punitive damage portion of any jury award. It was the first and only reservation of rights letter ever issued by AIG in connection with McNamara Action, and stated no other reservation of rights.

COMPLAINT - 10 -

39. Mr. Scott refused to contradict AIG's assessment that the newly-discovered documents would only generate punitive damages exposure. The Archer Norris attorneys would have contradicted that assessment – and had previously done so in direct conversations with Mr. Scott – but at this point they were not involved in the dialogue between Mr. Scott, FelCor, and AIG regarding the McNamaras' pending demand. With the October 31 deadline rapidly approaching, FelCor judged that it had no choice but to accept the settlement demand subject to the funding arrangement proposed by AIG.

40. AIG's only motive for attempting to generate false panic about punitive damages was to avoid paying more than $6.5 million toward settlement of the McNamara Action. AIG knew that, in reality, there was little or no risk of a non-covered punitive damage award in the McNamara Action. There was, however, a very serious risk that the jury would award covered compensatory damages in excess of the $13.5 million settlement demand, and it was virtually certain that the jury would award compensatory damages in excess of AIG's purported $7.5 million case valuation. Thus, AIG deployed a strategy designed to guarantee that it would pay no more than $6.5 million in connection with the McNamara case: coercing FelCor to contribute to a settlement.

41. FelCor's only alternative would have been to reject the settlement demand and prepare for trial, then just one month away. The risks of doing so were unacceptably high. FelCor had no defense to liability in the McNamara Action. If the case went to trial, a substantial judgment would be entered against FelCor, very likely for an amount between $12 and $20 million. Although such a judgment would have been within the limits of FelCor's insurance, allowing the case to go to trial had numerous other potential negative consequences for FelCor. Those potential consequences included, but were not limited to:

(a) FelCor executives felt strongly that it would be wrong to force the McNamaras to go to trial in order to recover damages for their injuries and suffering. FelCor acknowledged its liability and believed the McNamaras needed to be compensated. According to experienced California defense counsel, the McNamaras' settlement demand was on the low end of the range of likely jury outcomes, and well within the limits of FelCor's

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT - 11 -

31003\4753013.1

1    insurance. Under these circumstances, FelCor believed and believes the right thing to do
2    was to accept the McNamaras' demand, not force the McNamaras to go to trial. FelCor
3    believed and believes that this was precisely why it had been paying AIG millions of
4    dollars in insurance premiums – in order to provide fair compensation for injuries.
5    (b) FelCor would have to endure the monetary, physical, emotional, and reputational costs
6    of a full-blown, public trial regarding a tragic injury suffered by a guest at a FelCor
7    property. FelCor very much wanted to avoid those costs.
8    (c) FelCor knew that a trial always presents the risk of a "runaway jury" awarding
9    plaintiffs all of their claimed damages – or even more.
10   (d) AIG had falsely represented to FelCor that it would very likely face a substantial
11   punitive damage award if the case went to verdict.

AIG knew all of this, and knew that FelCor was highly motivated to avoid a trial of the McNamara Action. But instead of working together toward the common goal of settlement, AIG used FelCor's desire to avoid a trial against FelCor, strong-arming FelCor into contributing to a settlement that should have been funded 100% by insurance.

42.    Immediately after the FelCor Defendants reached a settlement in principle with the McNamaras, AIG dropped its participation in the defense of the case. Mr. Scott abruptly announced his intent to withdraw as counsel of record. In a November 19, 2014 email from Mr. Padilla, AIG declared that it did not wish to participate in the remaining portion of the McNamara litigation, which involved the FelCor Defendants' cross-claims for indemnity against the HVAC contractors, and stated that it was willing to forgo any possible recovery from those contractors: "AIG does not intend to pursue claims against co-defendants or their respective policies in this matter. Once AIG has funded its share of the settlement of plaintiffs' claims against Felcor [*sic*] it will consider its involvement concluded."

43.    On January 7, 2015, FelCor funded a $6 million portion of the McNamara settlement, wiring this sum to the McNamaras' counsel.

## FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT)

44. Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 44 as if fully set forth herein.

45. The Umbrella Policy constitutes a valid and enforceable written contract between Plaintiff and Defendant, which obligates Defendant to provide insurance coverage for all amounts which Plaintiff becomes legally obligated to pay as damages because of Bodily Injury.

46. Plaintiff has fully satisfied its obligations under the Policies, save for any requirements which have been waived or which are excused by Defendant's breaches.

47. Defendant has breached its contractual obligations by failing to pay a $6 million portion the McNamara Action settlement.

48. As a proximate result of Defendant's breach of contract, Plaintiff has been damaged in an amount to be proven at trial.

49. WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### (DECLARATORY RELIEF)

50. Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 50 as if fully set forth herein.

51. An actual controversy has arisen and now exists between Plaintiff, on the one hand, and Defendant, on the other hand, concerning Plaintiff's contention that Defendant breached its obligations under the Umbrella Policy by improperly refusing to pay the full amount of the McNamara Action settlement.

52. Plaintiff desires a judicial determination of the respective rights and obligations of Plaintiff and Defendant with respect to funding of the McNamara Action settlement.

53. A judicial determination is necessary and appropriate at this time under the circumstances so that Plaintiff, on the one hand, and Defendant, on the other hand, may ascertain their respective rights and duties under the Umbrella Policy.

54. WHEREFORE, Plaintiff prays for relief as set forth below.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

COMPLAINT - 13 -

31003\4753013.1

# THIRD CAUSE OF ACTION

## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

55. Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 55 as if fully set forth herein.

56. The Umbrella Policy contains an implied covenant of good faith and fair dealing under which Defendant agreed not to take any action that would deprive Plaintiff of the rights and benefits due to it under the Umbrella Policy.

57. Defendant tortiously breached the implied covenant of good faith and fair dealing, by, among other things, negligently, unreasonably, without proper cause, and/or willfully denying coverage for a portion of the McNamara Action settlement.

58. Defendant also tortiously breached the implied covenant of good faith and fair dealing by unreasonably coercing Plaintiff to contribute to the McNamara settlement. Defendant advised Plaintiff that Plaintiff had very substantial punitive damage exposure; that punitive damages were not covered by the policy; and that, in order to settle, Plaintiff had to contribute nearly half of the settlement. Plaintiff followed that advice, and paid $6 million of the settlement from its own pocket. But in fact, Defendant's advice was intentionally false, and Plaintiff had no serious punitive damage exposure. In so doing, Defendant clearly was acting in bad faith. Defendant failed to reasonably cooperate with Plaintiff's defense against a possible punitive damages claim, and instead used Plaintiff's concern about such damages to coerce Plaintiff to pay $6 million of a $13.5 million settlement, thus reducing Defendant's own outlay.

59. As a proximate result of Defendant's tortious breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as set forth herein, including, but not limited to, the attorneys fees that have been and will be incurred in establishing its right to insurance coverage (*Brandt v. Superior Court*, 37 Cal. 3d 813, 817 (1985)), and other consequential damages in an amount to be proven at trial.

60. Defendant's conduct was willful, fraudulent, malicious, oppressive, and in conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendant.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT - 14 -

31003\4753013.1

61.     WHEREFORE, Plaintiff prays for relief as set forth below.

**PRAYER FOR RELIEF**

62.     On the First Cause of Action, for actual damages in an amount to be proven at trial;

63.     On the Second Cause of Action, for a judicial determination that Defendant breached its contractual obligations by refusing to pay the full amount of the McNamara Action settlement;

64.     On the Third Cause of Action, for actual damages in an amount to be proven at trial;

65.     On the Third Cause of Action, for punitive damages in an amount to be determined at trial;

66.     For costs of suit incurred herein, including reasonable attorneys' fees; and

67.     For such other and further relief as the Court deems just and proper.

Dated: March 16, 2015                    FARELLA BRAUN + MARTEL LLP


By:/s/ Erica Villanueva
    Adam C. Dawson
    Erica Villanueva
    Unnati Gandhi

Attorneys for Plaintiff
FELCOR LODGING TRUST INCORPORATED

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues properly triable in this action.

Dated: March 16, 2015                    FARELLA BRAUN + MARTEL LLP


By:/s/ Erica Villanueva
    Adam C. Dawson
    Erica Villanueva
    Unnati Gandhi

Attorneys for Plaintiff
FELCOR LODGING TRUST INCORPORATED

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

COMPLAINT                                - 15 -                                31003\4753013.1